# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| GENERAL MOTORS LLC,<br><br>                    Plaintiff,<br><br>        v.<br><br>CARPENTER CO.; E.R. CARPENTER, L.P.; CARPENTER HOLDINGS, INC.; DOMFOAM INTERNATIONAL, INC.; VALLE FOAM INDUSTRIES (1995), INC.; FLEXIBLE FOAM PRODUCTS, INC.; OHIO DECORATIVE PRODUCTS, INC.; FOAMEX INNOVATIONS, INC.; FUTURE FOAM, INC.; HICKORY SPRINGS MANUFACTURING CO.; INOAC USA INC.; INOAC CORP.; CREST FOAM INDUSTRIES INC.; LEGGETT & PLATT INC.; MOHAWK INDUSTRIES INC.; OTTO BOCK POLYURETHANE TECHNOLOGIES, INC.; PLASTOMER CORP.; SCOTTDEL INC.; LOUIS CARSON; DAVID CARSON; VITAFOAM PRODUCTS CANADA LTD.; VITAFOAM INC.; BRITISH VITA UNLIMITED; WOODBRIDGE FOAM CORP.; WOODBRIDGE SALES & ENGINEERING, INC.; WOODBRIDGE FOAM FABRICATING, INC.,<br><br>                    Defendants. | CASE NO.  2:12-cv-14967<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**(1)  VIOLATION OF THE SHERMAN ACT PURSUANT TO 15 U.S.C. § 1**<br><br>**(2)  VIOLATION OF MICHIGAN ANTITRUST REFORM ACT PURSUANT TO MICH. COMP. LAWS § 445.772**<br><br>**(3)  UNJUST ENRICHMENT**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff General Motors LLC ("GM" or "Plaintiff") brings this action for damages against all Defendants named herein and hereby alleges as follows:

## I.    INTRODUCTION

1.    GM brings this action to recover damages incurred as a result of a long-running conspiracy among Defendants and their co-conspirators that had the purpose and effect of fixing, raising, stabilizing, and/or maintaining prices and allocating customers for flexible polyurethane foam and products containing flexible polyurethane foam (collectively, "Polyurethane Foam").

2.      From at least January 1, 1999 to the present ("the Conspiracy Period"), through numerous in-person meetings, telephone calls, emails, faxes, and other communications in the United States and elsewhere, Defendants and their co-conspirators conspired with the purpose and effect of fixing, raising, stabilizing, and/or maintaining prices and allocating customers for Polyurethane Foam in the United States and elsewhere in North America.

3.      Several Defendants have already admitted to their role in this conspiracy.  In February 2010, Vitafoam Inc. voluntarily approached the U.S. Department of Justice ("DOJ"), Antitrust Division, to self-report evidence of illegal anticompetitive activities among itself and other companies and individuals in the Polyurethane Foam industry and to seek acceptance into the DOJ's Corporate Leniency Program.  Since that time, Vitafoam and its employees (including former employees of Defendant Woodbridge) have been cooperating with a criminal investigation into illegal anticompetitive conduct in the Polyurethane Foam industry.

4.       On January 5, 2012, Defendants Domfoam and Valle pled guilty to conspiracy under the Canadian Competition Act and were fined a total of $12.2 million for participating in a price-fixing cartel for Polyurethane Foam.  Domfoam and Valle admitted that they had agreed with competitors to fix the price of Polyurethane Foam products over a period of eleven years.

## II.  __NATURE OF ACTION__

5.      GM is a United States company that, during the Conspiracy Period, purchased billions of dollars of automotive seating systems, seat covers, headliners, acoustic systems solutions, pillars, textile lamination, and other components containing Polyurethane Foam manufactured by Defendants and their co-conspirators both directly from Defendants and from other vendors.  As a direct, substantial, and reasonably foreseeable result of Defendants' and their co-conspirators' unlawful conduct and conspiracy to fix the prices of Polyurethane Foam,

the prices of Polyurethane Foam purchased by GM were artificially inflated.  Thus, GM suffered damages as a result of Defendants' and their co-conspirators' conspiracy and brings this action to recover the overcharges paid for Polyurethane Foam it purchased during the Conspiracy Period.

6.      As used in this complaint, "Polyurethane Foam" refers to flexible polyurethane foam of any grade of blend, including both slabstock and molded flexible polyurethane foam, both of which were the focus of the conspiracy alleged herein.  Polyurethane Foam is a commodity widely used for cushioning and insulation in a variety of goods, including but not limited to motor vehicles, furniture, bedding, packaging, and flooring.  GM purchased both slabstock and molded flexible polyurethane foam from Defendants during the Conspiracy Period.

7.      GM brings this action seeking federal injunctive relief under Section 16 of the Clayton Act, 15 U.S.C. § 26, for violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.  GM also seeks to recover damages under Section 4 of the Clayton Act and under the antitrust and unjust enrichment laws of the State of Michigan.  GM also seeks to recover taxable costs and the costs of suit, including reasonable attorneys' fees, for the injuries that GM suffered as a result of the Defendants' and their co-conspirators' conspiracy to fix, raise, maintain, and stabilize the prices of Polyurethane Foam.

## III.  <u>JURISDICTION AND VENUE</u>

8.      GM brings this action to recover damages, including treble damages, costs of suit, and reasonable attorneys' fees, as well as injunctive relief, arising from Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15, 26, to obtain treble damages and injunctive relief against all defendants.

9.      GM also brings this action pursuant to the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq.*, for injunctive relief and damages that GM sustained due to

Defendants' and their co-conspirators' flagrant violation of Section 2 of the Michigan Antitrust Reform Act ("MARA").

10.     GM also brings its claim for unjust enrichment under the laws of the State of Michigan.

11.     Pursuant to 28 U.S.C. §§ 1331 and 1337, the Court has jurisdiction over GM's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act.

12.     Pursuant to 28 U.S.C. § 1367, the Court has supplemental jurisdiction over GM's claims under MARA and its claim for unjust enrichment.  These state law claims are so related to GM's claims under Section 1 of the Sherman Act and Sections 4 and 16 of the Clayton Act that they form part of the same case or controversy.

13.     The activities of Defendants and their co-conspirators, as described herein, involved United States import trade or import commerce and/or were within the flow of, were intended to, and did have a direct, substantial, and reasonably foreseeable effect on United States domestic and import trade or commerce.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of Polyurethane Foam purchased in the United States.  These effects give rise to GM's antitrust claims.

14.     The activities of Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have a direct and substantial effect on commerce in Michigan.  In particular, Defendants' and their co-conspirators' conspiracy directly and substantially affected the price of Polyurethane Foam purchased in Michigan.  These effects also give rise to GM's antitrust claims.  GM maintained its headquarters, including its United States procurement team, in Michigan during and after the Conspiracy Period.

4

15.     This court has jurisdiction over each Defendant named in this action under both Section 12 of the Clayton Act, 15 U.S.C. § 22, and Section 705 of the Michigan Revised Judicature Act, Mich. Comp. Laws § 600.705.  Each Defendant conducts substantial business in Michigan.  In addition, Defendants and their co-conspirators purposefully availed themselves of the laws of the United States and the state of Michigan insofar as they manufactured Polyurethane Foam which was sold in the United States, including Michigan, or which was incorporated into products containing Polyurethane Foam that Defendants and their co-conspirators knew would be sold to customers in the United States and Michigan.  Defendants' and their co-conspirators' conspiracy affected this commerce in Polyurethane Foam in the United States and Michigan.  Accordingly, each of the Defendants maintains minimum contacts with this District more than sufficient to subject it to service of process and sufficient to comply with due process of law.

16.     Venue is proper in the Eastern District of Michigan under Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391 because each Defendant is either an alien corporation, transacts business in this District, or is otherwise found within this District.  In addition, venue is proper in this District under 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to this claim occurred in this district.  Defendants and their co-conspirators knew that price-fixed Polyurethane Foam would be sold and shipped into this District.

## IV.    THE PARTIES

### A.    Plaintiff

#### 1.    GM

17.    Plaintiff General Motors LLC is a Delaware limited liability company with its principal place of business at 300 Renaissance Center in Detroit, Michigan.  General Motors LLC is one of the world's largest manufacturers of motor vehicles, producing cars and trucks through brands such as Chevrolet, Buick, GMC, Cadillac, Baojun, Holden, Isuzu, Jiefang, Opel, Vauxhaull, and Wuling.  In July 2009, General Motors LLC acquired all the claims, unless specifically excluded, of the former General Motors Corporation which was then known as Motors Liquidation Company ("MLC").  During the Conspiracy Period, therefore, General Motors LLC either purchased automotive seating systems, seat covers, headliners, acoustic systems solutions, pillars, textile lamination, and other components containing Polyurethane Foam manufactured and sold by Defendants, their co-conspirators, and others or acquired the claims held by the former General Motors Corporation with respect to the claims advanced in this complaint.  As a result of Defendants' conspiracy, General Motors LLC has been injured in its business and property because the prices it paid for such products containing Polyurethane Foam were artificially inflated as a direct result of Defendants' and their co-conspirators' illegal price-fixing and customer-allocation conspiracy.

### B.    Defendants

#### 1.    Carpenter

18.    Defendant Carpenter Company ("Carpenter U.S.") is a privately owned and operated company with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  Carpenter U.S. operates at least 15 facilities in the United States and produces

more Polyurethane Foam than any other company in the world.  Carpenter U.S. manufactures and distributes Polyurethane Foam for automotive applications, carpet cushion products, furniture, packaging and bedding, including cushioning, mattresses, mattress pads, and pillows. During the Conspiracy Period, Carpenter U.S. directly sold Polyurethane Foam throughout the United States.

19.     Defendant E.R. Carpenter, L.P. (f/k/a Carpenter Chemical, L.P.) ("E.R. Carpenter") is a Virginia limited partnership with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  During the Conspiracy Period, E.R. Carpenter directly sold Polyurethane Foam throughout the United States.

20.     Defendant Carpenter Holdings, Inc. ("Carpenter Holdings," collectively with Carpenter U.S. and E.R. Carpenter, "Carpenter") is a Virginia corporation with its principal place of business at 5016 Monument Avenue, Richmond, Virginia 23230.  During the Conspiracy Period, Carpenter Holdings directly sold Polyurethane Foam throughout the United States.

21.     Carpenter is the world's largest producer of flexible foam products for comfort cushioning.  During the Conspiracy Period, Carpenter sold a substantial amount of Polyurethane Foam at artificially high prices.  Carpenter benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 2.     Domfoam and Valle

22.     Defendant Domfoam International, Inc. ("Domfoam") is a subsidiary of Valle Foam Industries with its principal place of business at 8785 Langelier Boulevard, Montreal, Quebec, H1P 2C9 Canada.  During the Conspiracy Period, Domfoam directly sold Polyurethane Foam throughout the United States.  Domfoam manufactures Polyurethane Foam primarily for the bedding, flooring, furniture, and packaging industries.

7

23.     Defendant Valle Foam Industries (1995), Inc. ("Valle") is a privately owned and operated corporation with its principal place of business at 4 West Drive, Brampton, Ontario L6T 2H7, Canada.  Valle manufactures Polyurethane Foam for, *inter alia*, the furniture, bedding, packaging, and flooring industries.  During the Conspiracy Period, Valle and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

24.     Valle participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority.  Further, Valle benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Valle also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Domfoam.  Valle dominated or controlled Domfoam regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

25.     On January 5, 2012, Domfoam and Valle pleaded guilty to conspiracy under the Canadian Competition Act and were fined a total of $12.2 million for participating in a price-fixing cartel for Polyurethane Foam.

26.     Domfoam and Valle admitted they had agreed with competitors to fix the price of Polyurethane Foam products manufactured at their plants during the Conspiracy Period.  This admitted conspiracy is part of the conspiracy that gives rise to Plaintiff's claims.

### 3.     Flexible Foam

27.     Defendant Flexible Foam Products, Inc. ("Flexible Foam Products") is a privately owned and operated Ohio company with its principal place of business at 12575 Bailey Road, Spencerville, Ohio 45887, and operations in Texas, Indiana, Florida, and Wisconsin.  Flexible Foam Products is a subsidiary of Ohio Decorative Products, Inc., also of Spencerville, Ohio.

8

Flexible Foam Products is a national leader in the foam industry, and manufactures Polyurethane Foam and rebond products for customers in the bedding, flooring, furniture, packaging, and transportation industries.  During the Conspiracy Period, Flexible Foam Products directly sold Polyurethane Foam throughout the United States.

28.     Defendant Ohio Decorative Products, Inc. ("Ohio Decorative"; collectively with Flexible Foam Products, "Flexible Foam") is a private corporation with its principal place of business at 220 S. Elizabeth Street, Spencerville, Ohio 45887.  Ohio Decorative is the parent company of Flexible Foam Products.  During the Conspiracy Period, Ohio Decorative and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

29.     Ohio Decorative participated in the conspiracy through the actions of its respective officers, employees, and representatives acting with actual or apparent authority.  Further, Ohio Decorative benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Ohio Decorative also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Flexible Foam Products as evidenced by, among other reasons and upon information and belief, Ohio Decorative's domination or control over Flexible Foam Products with respect to one or more of the following activities:

> (i)     the prices at which Flexible Foam Products sold Polyurethane Foam;
> (ii)    the hiring and firing of officers or members of the Board of Directors of Flexible Foam Products;
> (iii)   the budget for Flexible Foam Products;
> (iv)    the capitalization of and/or loans to Flexible Foam Products;
> (v)     the transfer of officers or employees between Ohio Decorative and Flexible Foam Products;
> (vi)    financial benefits provided to officers or employees of Flexible Foam Products;
> (vii)   the business plan or operation of Flexible Foam Products;
> (viii)  officers or employees of Ohio Decorative communicated with, serviced, or called on purchasers of Polyurethane Foam despite the presence or with the knowledge of Flexible Foam Products;

9

    (ix)   Ohio Decorative used Flexible Foam Products as its instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale, or production of Polyurethane Foam obtained through conspiracy communications which Ohio Decorative, in turn, used to make sure that Flexible Foam Products charged Plaintiff and/or others supracompetitive prices for Polyurethane Foam; and/or

    (x)   Ohio Decorative and Flexible Foam Products have a unified marketing image, including common branding products and/or common corporate logos, insignias, or other marks.  Ohio Decorative dominated or controlled Flexible Foam Products regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

### 4.   Foamex

30.     Defendant Foamex Innovations, Inc. (f/k/a Foamex International, Inc.) ("Foamex") is a privately owned and operated company with its principal place of business at Rose Tree Corporate Center II, 1400 N. Providence Road, Suite 2000, Media, Pennsylvania 19063-2076.  Upon information and belief, Foamex acquired the assets and liabilities of Foamex International, Inc., Foamex L.P., BFF Foam Corp., and 2422755 Canada Inc. (f/k/a Foamex Canada Inc.) ("Foamex Canada"), including the liabilities arising from or related to the antitrust violations alleged herein.  During the Conspiracy Period, Foamex directly and/or through Foamex International, Inc., Foamex L.P., BFF Foam Corp., and or Foamex Canada manufactured and/or directly sold Polyurethane Foam throughout the United States.

31.     Before Foamex acquired the assets and liabilities of Foamex International, Inc., Foamex L.P., BFF Foam Corp., and Foamex Canada, each of those entities participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Further, Foamex International, Inc. and/or Foamex L.P. benefited from the conspiracy by receiving greater profits than they would have received had the conspiracy not existed.  BFF Foam Corp. and Foamex Canada also were members of the conspiracy by virtue of their status during the Conspiracy Period as the alter ego or agent of

10

Foamex International, Inc. and/or Foamex L.P., as evidenced by, among other reasons and upon information and belief, Foamex International, Inc.'s and/or Foamex L.P.'s domination or control over BFF Foam Corp. and/or Foamex Canada with respect to one or more of the following activities:

(i)    the prices at which BFF Foam Corp. and/or Foamex Canada sold Polyurethane Foam;

(ii)   the hiring and firing of officers or members of the Board of Directors of BFF Foam Corp. and/or Foamex Canada;

(iii)  the budgets for BFF Foam Corp. and/or Foamex Canada;

(iv)  the capitalization of and/or loans to BFF Foam Corp. and/or Foamex Canada;

(v)   the transfer of officers or employees between BFF Foam Corp. and/or Foamex Canada and Foamex International, Inc. and/or Foamex L.P.;

(vi)  financial benefits provided to officers or employees of BFF Foam Corp. and/or Foamex Canada;

(vii) the business plan or operation of BFF Foam Corp. and/or Foamex Canada;

(viii) officers or employees of Foamex International, Inc. and/or Foamex L.P. communicated with, serviced, or called on purchasers of Polyurethane Foam despite the presence or with the knowledge of BFF Foam Corp. and/or Foamex Canada;

(ix)  Foamex International, Inc. and/or Foamex L.P. used BFF Foam Corp. and/or Foamex Canada as its/their instrumentality or conduit to obtain information about other Defendants' and/or co-conspirators' pricing, sale, or production of Polyurethane Foam in the United States and/or elsewhere, which Foamex International, Inc. and/or Foamex L.P. used to charge Plaintiff and others supracompetitive prices for Polyurethane Foam; and/or

(x)   Foamex International, Inc. or Foamex L.P. and BFF Foam Corp. or Foamex Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias, or other marks.  Foamex International, Inc. and/or Foamex L.P. dominated or controlled BFF Foam Corp. and Foamex Canada regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

32.     Further, after Foamex acquired the assets and liabilities of Foamex International, Inc., Foamex L.P., BFF Foam Corp., and Foamex Canada, Foamex continued to participate in conspiracy activities and charge artificially high prices for Polyurethane Foam.

33.     Foamex provides foam for the home, healthcare, electronics, industrial, personal care, and transportation industries.  Its Polyurethane Foam is used in automotive cushioning,

11

shipping packages, beds, and furniture. Foamex also provides components for filters, dispensers, gaskets, and seals for products ranging from blood oxygenators to computer disk drives.

### 5. Future Foam

34.     Defendant Future Foam, Inc. ("Future Foam") is a privately owned and operated company with its principal place of business at 1610 Avenue N, Council Bluffs, Iowa 51501. Future Foam produces Polyurethane Foam for the bedding, flooring, furniture, and packaging industries. During the Conspiracy Period, Future Foam directly sold Polyurethane Foam throughout the United States.

35.     During the Conspiracy Period, Future Foam sold Polyurethane Foam at artificially high prices. Future Foam benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 6. Hickory Springs

36.     Defendant Hickory Springs Manufacturing Company ("Hickory Springs") is a North Carolina corporation with its principal place of business at 235 2nd Avenue, NW, Hickory, North Carolina 28601. During the Conspiracy Period, Hickory Springs directly sold Polyurethane Foam throughout the United States.

37.     Hickory Springs is one of the nation's largest integrated component manufacturers and suppliers for the furniture and bedding industries, with more than sixty operating facilities in the United States and throughout the world. The furniture industry is the largest segment of Hickory Springs' customer base. Producing Polyurethane Foam for furniture, bedding, automotive, packaging, floor covering, marine, and medical applications, Hickory Springs is one of the largest producers of Polyurethane Foam in the world.

38.     During the Conspiracy Period, Hickory Springs sold Polyurethane Foam at artificially high prices.  Hickory Springs benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 7.     Inoac

39.     Defendant Inoac Corporation ("Inoac Corp.") is a Japanese company with its principal place of business located at 2-13-4 Meieki Minami, Nakamura-ku, Nagoya 450-0003, Japan.  Inoac Corp. makes Polyurethane Foam for, *inter alia*, furniture, bedding, and cushions.  During the Conspiracy Period, Inoac Corp. and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

40.     Defendant Inoac USA Inc. ("Inoac USA" collectively with Inoac Corp., "Inoac") is a private corporation with its principal place of business at 901 1/2 Nutter Drive, Bardstown, Kentucky 40004.  Inoac USA is the parent company of Defendant Crest Foam Industries Inc.  Inoac USA is itself a subsidiary of Inoac Corp., and part of Inoac's overseas network engaged in foam products fabrication sales.  During the Conspiracy Period, Inoac USA and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

41.     Inoac Corp. participated in the conspiracy through the actions of its officers, employees, and representatives acting with actual or apparent authority.  Further, Inoac Corp. benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Inoac Corp. also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Inoac USA.  Inoac Corp. dominated or controlled Inoac USA regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

13

### 8.  Crest

42.     Defendant Crest Foam Industries Inc. ("Crest") is a Delaware corporation with its principal place of business at 100 Carol Place, Moonachie, New Jersey 07074.  Crest, a wholly owned subsidiary of Inoac USA, was formerly a joint venture between Vitafoam and Inoac Corp. in which Vitafoam had majority control.  In 2010, Inoac took 100% control of Crest.  During the time period for which Vitafoam had majority control of Crest, executives of Vitafoam acted as agents for Crest in the conspiracy alleged in this Complaint.  Crest manufactures and/or distributes Polyurethane Foam for automotive, cushioning, and medical applications.  During the Conspiracy Period, Crest and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

43.     During the Conspiracy Period, Crest sold Polyurethane Foam at artificially high prices.  Crest benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 9.  Leggett

44.     Defendant Leggett & Platt Inc. ("Leggett") is a Missouri corporation with its principal place of business at 1 Leggett Road, Carthage, Missouri 64836.  Leggett manufactures Polyurethane Foam and other components for the automotive, bedding, and furniture industries.  During the Conspiracy Period, Leggett and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

45.     During the Conspiracy Period, Leggett sold Polyurethane Foam at artificially high prices.  Leggett benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 10.    Mohawk

46.    Defendant Mohawk Industries Inc. ("Mohawk") is a Delaware corporation with its principal place of business located at 160 S. Industrial Boulevard, Calhoun, Georgia 30701. Mohawk manufactures Polyurethane Foam and other components for the flooring industry. During the Conspiracy Period, Mohawk and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

47.    During the Conspiracy Period, Mohawk sold Polyurethane Foam at artificially high prices.  Mohawk benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 11.    Otto Bock

48.    Defendant Otto Bock Polyurethane Technologies, Inc. ("Otto Bock") is a private company with its principal place of business at 3 Penn Center West, Suite 406, Pittsburgh, Pennsylvania 15276.  Otto Bock is a subsidiary of Otto Bock Holding GmbH & Co. KG, a German company with its principal place of business at Max-Naeder-Street 15, 37115 Duderstadt, Germany.  Billing itself as "Best in Foam," Otto Bock manufactures and/or distributes Polyurethane Foam for automotive, furniture, and medical applications.  During the Conspiracy Period, Otto Bock and/or affiliates it controlled sold Polyurethane Foam throughout the United States.

49.    During the Conspiracy Period, Otto Bock sold a substantial amount of Polyurethane Foam at artificially high prices.  Otto Bock benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 12.  Plastomer

50.     Defendant Plastomer Corporation ("Plastomer") is a private company with its principal place of business at 37819 Schoolcraft Road, Livonia, Michigan 48150.  Plastomer, which describes itself as "the recognized Pioneer in Flexible Foam products for manufacturing industries in North America and the World," produces and sells Polyurethane Foam primarily for automotive applications.  During the Conspiracy Period, Plastomer and/or affiliates it controlled sold Polyurethane Foam throughout the United States.

51.     During the Conspiracy Period, Plastomer sold Polyurethane Foam at artificially high prices.  Plastomer benefited from the conspiracy by receiving extra profits it would not have received had the conspiracy not existed.

### 13.  Scottdel

52.     Defendant Scottdel Inc. ("Scottdel") is a privately held corporation with its headquarters at 400 Church Street, Swanton, Ohio 43558.  Scottdel was placed into receivership in the action *Fifth Third Bank v. Scottdel, Inc.*, No. 10-CV-000293 (Ct. Common Pleas, Fulton Cty., Ohio).  During the Conspiracy Period, Scottdel and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

53.     Defendant Louis Carson is a United States citizen and a resident of Swanton, Ohio.  Mr. Carson was the president of Scottdel whose responsibilities included, setting prices for Scottdel's products throughout the United States.  During the Conspiracy Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell Polyurethane Foam throughout the United States.

54.     Defendant David Carson is a United States citizen and resident of Swanton, Ohio.  Mr. Carson was the vice president of manufacturing at Scottdel whose responsibilities included

setting prices for Scottdel's products throughout the United States.  During the Conspiracy Period, Mr. Carson directed Scottdel and/or affiliates it controlled to directly sell Polyurethane Foam throughout the United States.

55.     Scottdel began manufacturing bonded urethane carpet cushion in 1961 and manufactures a complete line of commercial and residential bonded urethane cushions ranging in density from 3.5 pounds to 10 pounds per cubic foot.

56.     During the Conspiracy Period, Scottdel sold a substantial amount of Polyurethane Foam at artificially high prices.  Scottdel, Louis Carson, and David Carson benefited from the conspiracy by receiving extra profits they would not have received had the conspiracy not existed.

### 14.     Vitafoam

57.     Defendant Vitafoam Products Canada Limited ("Vitafoam Canada") is a privately owned and operated company with its headquarters at 150 Toro Road, North York, Ontario M3J 2A9, Canada.  Vitafoam Canada manufactures Polyurethane Foam for use in furniture, bedding, and automotive applications, including packaging, medical, and industrial, as well as a full range of memory foams.  During the Conspiracy Period, Vitafoam Canada and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

58.     Defendant British Vita Unlimited ("Vitafoam UK") is a company organized and existing under the laws of the United Kingdom, with its principal place of business in London, United Kingdom.  Its ultimate parent is Vita Cayman Limited, itself located in Grand Cayman. Vitafoam UK controls the Vita Group, which includes among its members Vitafoam Canada and Vitafoam Inc., in addition to companies producing Polyurethane Foam operating in countries such as England, France, Germany, and the Netherlands.  During the Conspiracy Period,

17

Vitafoam UK and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

59.    Defendant Vitafoam Inc. is a privately owned and operated company with its headquarters a 2215 Shore Drive, High Point, North Carolina 27263.  During the Conspiracy Period, Vitafoam Inc. and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

60.    Vitafoam offers, among other things, Polyurethane Foam products for the packaging, furniture, and upholstery industries; Polyurethane Foam for fabric producers, laminators, trim companies, and original equipment manufacturers in the automotive industry; and Polyurethane Foam for the residential and commercial sectors.

61.    Defendants Vitafoam Canada, Vitafoam UK, and Vitafoam, Inc. (collectively, "Vitafoam") participated in the conspiracy through the actions of their respective officers, employees, and representatives acting with actual or apparent authority.  Further, Vitafoam UK benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Vitafoam UK was also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Vitafoam Canada and/or Vitafoam, Inc., as evidenced by, among other reasons and upon information and belief, Vitafoam UK's domination or control over Vitafoam, Inc. and/or Vitafoam Canada with respect to one or more of the following:

(i)    the prices at which Vitafoam, Inc. and/or Vitafoam Canada sold Polyurethane Foam;
(ii)   the hiring and firing of officers or members of the Board of Directors of Vitafoam, Inc. and/or Vitafoam Canada;
(iii)  the budget for Vitafoam, Inc. and/or Vitafoam Canada;
(iv)   the capitalization of and/or loans to Vitafoam, Inc. and/or Vitafoam Canada;
(v)    the transfer of officers or employees between Vitafoam UK and Vitafoam, Inc. and/or Vitafoam Canada;

18

(vi) financial benefits provided to officers or employees of Vitafoam, Inc. and/or Vitafoam Canada;

(vii) the business plan or operation of Vitafoam, Inc. and/or Vitafoam Canada;

(viii) officers or employees of Vitafoam UK communicated with, serviced, or called on purchasers of Polyurethane Foam despite the presence or with the knowledge of Vitafoam, Inc. and/or Vitafoam Canada;

(ix) Vitafoam UK used Vitafoam, Inc. and/or Vitafoam Canada as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale, or production of Polyurethane Foam in the United States and/or elsewhere, which Vitafoam UK used to make sure that Vitafoam, Inc. charged Plaintiff and/or others supracompetitive prices for Polyurethane Foam; and/or

(x) Vitafoam UK and Vitafoam, Inc. and/or Vitafoam Canada had a unified marketing image, including common branding products and/or common corporate logos, insignias, or other marks. Vitafoam UK dominated or controlled Vitafoam Canada and Vitafoam, Inc. regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

62. In February 2010, Vitafoam voluntarily approached the DOJ to self-report evidence of illegal anticompetitive activities among itself and other companies and individuals in the Polyurethane Foam industry and to seek acceptance into the DOJ's Corporate Leniency Program. Since that time, Vitafoam and its employees have been cooperating with a criminal investigation into illegal anticompetitive conduct in the Polyurethane Foam market.

**15. Woodbridge**

63. Defendant Woodbridge Foam Corporation ("Woodbridge Foam") is a Canadian corporation with its headquarters at 4240 Sherwoodtowne Boulevard, Mississauga, Ontario L4Z 2G6, Canada. Woodbridge Foam and Inoac Corp. are members of the "World Polyurethane Alliance," a group of leading urethane manufacturers offering "world-class" manufacturing. During the Conspiracy Period, Woodbridge Foam and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

64. Defendant Woodbridge Sales & Engineering, Inc. ("Woodbridge S&E") is a Michigan corporation with its principal place of business at 1515 Equity Drive, Troy, Michigan

19

48084.  During the Conspiracy Period, Woodbridge S&E and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

65.     Defendant Woodbridge Foam Fabricating, Inc. ("WFFI"; collectively with Woodbridge Foam and Woodbridge S&E, "Woodbridge") is a private company with its principal place of business at 1120 Judd Road, Chattanooga, Tennessee 37406.  WFFI is a joint venture between Woodbridge Group and Inoac Corp.  During the Conspiracy Period, WFFI and/or affiliates it controlled directly sold Polyurethane Foam throughout the United States.

66.     Further, Woodbridge Foam benefited from the conspiracy by receiving greater profits than it would have received had the conspiracy not existed.  Woodbridge Foam was also was a member of the conspiracy by virtue of its status during the Conspiracy Period as the alter ego or agent of Woodbridge S&E and/or WFFI, as evidenced by, among other reasons and upon information and belief, Woodbridge Foam's domination or control over Woodbridge S&E and/or WFFI with respect to one or more of the following:

(i)     the prices at which Woodbridge S&E and/or WFFI sold Polyurethane Foam;
(ii)    the hiring and firing of officers, employees, or members of the Board of Directors of Woodbridge S&E and WFFI;
(iii)   the budget for Woodbridge S&E and WFFI;
(iv)    the capitalization of and/or loans to Woodbridge S&E and WFFI;
(v)     the transfer of officers or employees between Woodbridge S&E and WFFI and Woodbridge Foam;
(vi)    financial benefits provided to officers or employees of Woodbridge S&E and WFFI;
(vii)   the business plan or operation of Woodbridge S&E and WFFI;
(viii)  officers or employees of Woodbridge Foam communicated with, serviced, or called on purchasers of Polyurethane Foam despite the presence or with the knowledge of Woodbridge S&E and WFFI;
(ix)    Woodbridge Foam used Woodbridge S&E and WFFI as an instrumentality or conduit to obtain information about Defendants' and/or co-conspirators' pricing, sale, or production of Polyurethane Foam in the United States and/or elsewhere to make sure that Woodbridge S&E and WFFI charged Plaintiff and/or others supracompetitive prices for Polyurethane Foam; and/or
(x)     Woodbridge Foam and Woodbridge S&E and WFFI had a unified marketing image, including common branding products and/or common corporate logos,

20

insignias, or other marks.  Woodbridge Foam dominated or controlled Woodbridge S&E and WFFI regarding conspiracy activities and used that domination or control to charge artificially high prices for Polyurethane Foam.

67.     Woodbridge's primary focus is supplying Polyurethane Foam for automotive components, but Woodbridge also supplies Polyurethane Foam for commercial and recreational transportation, building products, construction, packaging, and several consumer and industrial products.

### C.     Agents and Co-Conspirators

68.     The acts alleged against the Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

69.     Each Defendant acted as the principal, agent, or joint venturer of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged herein. Each Defendant that is a subsidiary or affiliate of a foreign parent acts as the United States agent for Polyurethane Foam and/or Polyurethane Foam products made by its parent company.

70.     Various persons and/or entities, some identified and some not yet identified, participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.  When GM establishes the identities of such co-conspirators, GM will seek leave to amend this complaint to add such co-conspirators as Defendants.  These co-conspirators are believed to include, without limitation, A-Z Sponge & Foam Products Ltd. (also known as A to Z Foam), Broadway Foam & Fabric Supplies Ltd. (also known as Broadway Foam), and CMI Enterprises (also known as CMI Automotive).

## V.     THE MARKET FOR POLYURETHANE FOAM

71.     While there are many different uses for Polyurethane Foam, the uses generally can be grouped into three main product segments:  (1) block foam, also known as commodity or slabstock foam, which is poured and then cut for use in such products as furniture cushions and in automotive applications such as headliners, seat cover sets, door panels and parcel shelves, textile lamination, and insulators in the gas tank, trunk lining, instrument panels, package trays, transmission shift, and engine covers; (2) molded foam, which is fabricated for use in, among other things, automobile products such as seating systems, headrests, steering wheels, armrests, and consoles; and (3) carpet underlay, made primarily from scrap flexible foam.  By contrast, "rigid" or "technical" foam is primarily used in construction for insulation purposes.

72.     Polyurethane Foam is typified by open cells that make the end product soft, light, resilient, and breathable.  It is normally produced from a mixture of polyols and di- and/or poly-isocyanates, such as toluene diisocyanate ("TDI").

73.     To manufacture Polyurethane Foam for cushioning, two basic procedures are used.  In one method, used to manufacture slabstock, a chemical mix is poured onto a moving conveyor, where it is allowed to react and expand.  Sides on the conveyor allow the foam to rise into a "bun" or slab anywhere from two to four feet high.  The continuous slab is then cut, stored, and allowed to cure for up to twenty-four hours.  The cured foam is subsequently fabricated into useful shapes.  Most foam for use in furniture and bedding is produced this way.

74.     In the second method, used to manufacture molded, the same or substantially the same chemical mix is poured into shaped molds, allowing the foam reaction to take place.  This process is used primarily for automotive applications, although some furniture uses molded cushions.

22

75.     In 2010, domestic revenue for the polyurethane foam industry was projected at $12 billion.  Typically, flexible polyurethane foam (including slabstock, molded, and carpet underlay) averages between 70-85% of the total output of all polyurethane foam in the United States.  In 2009, Polyurethane Foam for furniture and bedding products accounted for approximately 38% of Polyurethane Foam sales revenue; Polyurethane Foam for transportation products accounted for approximately 32% of Polyurethane Foam sales revenue; Polyurethane Foam for flooring products accounted for approximately 25% of Polyurethane Foam sales revenue; and Polyurethane Foam for other end use—including but not limited to packaging and textiles—accounted for approximately 5% of Polyurethane Foam sales revenue.

## VI.    DEFENDANTS ENGAGED IN PRICE FIXING AND ALLOCATED CUSTOMERS OF POLYURETHANE FOAM IN THE UNITED STATES

76.     The Defendants conspired to raise the prices of Polyurethane Foam sold in the United States.  The conspiracy alleged herein was effectuated through a combination of meetings and other communications among the Defendants and their co-conspirators that took place in the United States, as well as in Canada.  Defendants fostered a culture of corruption within their companies, whereby their top executives engaged in frequent and continuous communications to set prices for and allocate markets of Polyurethane Foam.  These constant communications allowed Defendants to conspire to fix Polyurethane Foam prices across North America, including the United States.

### A.     Evidence Of The Conspiracy To Fix Polyurethane Foam Prices In The United States

#### 1.     Defendant Vitafoam Admits To The Conspiracy

77.     In February 2010, Vitafoam voluntarily approached the DOJ to self-report evidence of illegal anticompetitive activities amongst itself and other companies and individuals

23

in the Polyurethane Foam industry and to seek acceptance into the DOJ's Corporate Leniency

Program.  Since that time, Vitafoam and its employees have been cooperating with a criminal

investigation into illegal anticompetitive conduct in the Polyurethane Foam market.

78.    As a result of its application, Vitafoam has received a conditional leniency letter

from the DOJ, which necessarily means that Vitafoam admitted to its participation in a

conspiracy to violate U.S. antitrust laws.  As a November 19, 2008 document on the DOJ's

website explains, "a conditional leniency applicant must admit its participation in a criminal

antitrust violation involving price fixing . . . before it will receive a conditional leniency letter."

79.    In seeking conditional leniency from the DOJ and in connection with a pending

Canadian government investigation of antitrust violations by manufacturers of Polyurethane

Foam, several current and former Vitafoam employees agreed to be interviewed regarding the

Polyurethane Foam price-fixing conspiracy.  These interviews revealed certain details of the

mechanisms, participants, duration, and impact of the conspiracy.  These employees described a

cartel among Defendants, who are responsible for production of the majority of Polyurethane

Foam, and other co-conspirators.

80.    On September 26, 2011, Vitafoam admitted its participation in the conspiracy in

an Answer filed in the *Sealy* action:

a.    "In certain instances, the Vitafoam Defendants exchanged information
with competitors about price increases in polyurethane foam, and these communications included
the exchange of price increase announcements for polyurethane foam sold in the United States
and/or elsewhere, and/or discussions about the percentage or amount by which the Vitafoam
Defendants and other Defendants were going to increase prices of polyurethane foam sold in the
United States and/or elsewhere."  Answer of Vitafoam to Amended Complaint ¶ 69, *Sealy Corp.
v. Carpenter Co.*, No. 1:11-pf-10007 (N.D. Ohio filed Mar. 22, 2011), ECF No. 20.

b.    "[I]n certain instances, the Vitafoam Defendants communicated with
certain other Defendants to coordinate on price increases and allocate customers for flexible
polyurethane foam in the United States."  *Id.* ¶¶ 78, 81.

c.      "[I]n certain instances, the Vitafoam Defendants participated in conversations and meetings in the US and Canada to discuss price increases and allocate customers, issued price announcements in the United States and elsewhere that reflected these discussions, and exchanged information on price increases on the sale of polyurethane foam in the United States and elsewhere."  *Id.* ¶ 82.

### 2.    Domfoam And Valle Plead Guilty For Their Involvement In The Conspiracy

81.    On January 5, 2012, Domfoam and Valle pleaded guilty to violating the Canadian Competition Act and were fined a total of $12.2 million for participating in a price-fixing cartel for Polyurethane Foam.

82.    Domfoam and Valle admitted before the Ontario Superior Court in Ottawa that they had agreed with competitors to fix the price of Polyurethane Foam products manufactured at their plants in Brampton, Ontario; Delta, British Columbia; and Montreal, Quebec, over a period of eleven years. The companies' products are used mainly in carpet underlay, furniture, and bedding.  This Polyurethane Foam was sold in the United States in furtherance of the conspiracy alleged herein.

83.    On January 11, 2012, Domfoam and Valle president and CEO, Tony Vallecoccia, by affidavit attached as an exhibit to Domfoam and Valle's application for protection under the provisions of the Canadian insolvency regime, admitted that conduct by Domfoam and Valle, in collusion with other competitors, enabled coordination and implementation of increased prices for Polyurethane Foam sold to customers.

84.    In his affidavit referenced above, Tony Vallecoccia admitted that he was "satisfied that Domfoam and Valle Foam were culpable of the alleged violations under" the Canadian Competition Act for the relevant time periods of January 1999 to March 2010 and March 2010 to July 2010.

25

### 3. Vitafoam Employees Explain How Defendants Conspired To Fix Prices And Allocate Customers

85.     Defendants established a practice where they would communicate and reach an agreement or understanding on the percentage amount and timing of price increases and market allocation in the sale and supply of Polyurethane Foam.  Price increase discussions occurred approximately two to three times per year and often coincided with the bi-annual meetings held by the Polyurethane Foam Association ("PFA"), a trade association of United States Polyurethane Foam manufacturers.

86.     The general pretext used to explain the conspiratorial price increases was that such increases were due to increases in the cost of raw materials.  When Defendants' (or "foamers" as they are referred to at times in the industry) raw material suppliers announced price increases for chemical ingredients of foam, such as polyols and TDI, Defendants contacted each other because this provided an opportunity to agree to raise and stabilize Polyurethane Foam prices and allocate customers and markets, thereby collectively raising Polyurethane Foam prices.  Defendants viewed price fixing as necessary because, if Defendants did not increase their Polyurethane Foam prices by the same percentage amount and at around the same time period, the attempted price increase would fail.

87.     The conspiracy, understanding, and agreements regarding price increase percentage amounts among Defendants was the result of telephone conversations, exchanges of price increase letters, face-to-face meetings, email, and bilateral discussions among the competitors for the purpose of coordinating the amount and timing of price increases.

88.     During the Conspiracy Period, there was an understanding and agreement among the Defendants and their co-conspirators to collectively support supracompetitive prices.  This understanding and agreement was reached in actual discussions among competitors about the

26

percentage of price increases, the dates of the increases, and how the conspirators would announce the increases with the same, or nearly the same, effective dates. Indeed, prices for slabstock and molded Polyurethane Foam moved in a similar direction throughout the Conspiracy Period. Price increase announcement letters for both molded and slabstock foam, reflecting the prices determined by the conspirators, were then mailed to customers. Defendants policed these increases to ensure they were implemented by their co-conspirators, and they did not permit price reductions without the group's consent.

### a.    Former Vitafoam Executives

89.    An unnamed former president of Vitafoam ("Former Vitafoam President"), who worked for Vitafoam from the 1960s until October 2008, along with other individuals at Vitafoam, directly participated in the long-running price-fixing and customer allocation conspiracy alleged herein relating to Polyurethane Foam in the United States and elsewhere.

90.    Former Vitafoam President and Defendants engaged in frequent and regular unlawful communications during the Conspiracy Period, where they discussed and agreed to specific price increases and the timing of announcements regarding the effective date of those increases.

91.    Vitafoam had a purported company policy prohibiting contacts with competitors, but this policy was a mere facade and was ignored during the Conspiracy Period.

92.    As part of the conduct to coordinate and/or support price increases during the Conspiracy Period, Former Vitafoam President instructed his sales staff to send copies of their draft price increase letters to other Defendants and obtain other Defendants' versions of the same. Defendants used these draft letters to confirm their anticompetitive agreements and further implement the conspiracy. The Defendants with whom he spoke also discussed how

27

much each competitor wanted to raise prices, when the price increases should go into effect, and when the price increase letters should be issued.  As described below, these measures were used not only to set supracompetitive prices, but also to police the conspiracy and ensure compliance. Vitafoam personnel, including at least Steve Pendock, Gerry Hannah, David Gurley, Frank Roncadin, George Newton, Tim Prescott, Peter Farah, Ted Giroux, Rik Hennink, Mel Himel, and Fil Fonseca, participated in these discussions with other Defendants to share information about and reach agreement on price increases.

93.    Vitafoam's discussions about coordinating price increases among Defendants during the Conspiracy Period were conducted primarily by means of telephone, email, and in-person meetings.  In-person discussions frequently took place at PFA meetings, at least some of which occurred in the United States.

94.    Former Vitafoam President, along with his subordinates, had conspiratorial discussions during the Conspiracy Period (as described above) with other Defendants regarding fixing prices and allocating customers.  These discussions included at least Tony Dacosta, Al Zinn, and Doug Dauphin of Foamex; Max Tenpow of Carpenter; Bruce Schneider of Future Foam; Don Coleman of Hickory Springs; Robert Valle and Dean Brayiannis of Valle; and Robert Magee at Woodbridge.

95.    An unnamed former vice president of sales and marketing for Vitafoam ("Former Vitafoam Sales Vice President"), who has worked in the Polyurethane Foam industry since 1963, participated in interviews and admitted his role in the conspiracy.  He first worked for Woodbridge and then in 1973 joined Vitafoam's predecessor, Pre-Fab Cushioning Products. Former Vitafoam Sales Vice President worked for Vitafoam in Canada until he retired in March 2009.  He was personally involved in a long-running price-fixing and customer-allocation

conspiracy throughout North America along with other individuals at Vitafoam and other companies.

96.     Former Vitafoam Sales Vice President also participated in unlawful conduct during the Conspiracy Period with many individuals employed by numerous competitors, including at least Valle, Carpenter, Woodbridge, Flexible Foam, Hickory Springs, Domfoam, Scottdel, and Foamex.  The communications in which he participated, typically telephone calls, involved discussions of price increase percentages and effective dates of such increases.  The competitors exchanged copies of price increase letters to coordinate and support these increases. Individuals from competitors with whom Former Vitafoam Sales Vice President conspired to fix prices and allocate customers included at least Stanley Pauley, Ed Malacheck, Mark Kane, and Max Tenpow of Carpenter; Tony Vallecoccia, Dean Brayiannis, and Robert Valle of Valle; Doug Dauphin and Tony Dacosta of Foamex; and John Howard of Domfoam.

97.     Former Vitafoam Sales Vice President and Mark Kane of Carpenter had discussions on multiple occasions during the Conspiracy Period involving price increases concerning a mutual customer.  To coordinate their price increases and to ensure those increases went through for the mutual customer, Former Vitafoam Sales Vice President and Kane called each other and exchanged copies of draft price increase letters by fax.

98.     Robert Valle and Tony Vallecoccia of Valle also communicated with other Defendants by telephone and faxed each other copies of their draft price increase letters that would be sent to customers to coordinate and collude on price increase percentages and their effective dates.  They reported on these efforts to Vitafoam.

99.     Vitafoam employee David Gurley was a manager during the Conspiracy Period and involved in scrap foam obtained by Vitafoam for carpet underlay production.  During the

Conspiracy Period, Gurley had numerous contacts with other Defendants in furtherance of the conspiracy.  As a result of these contacts, Gurley provided the former Vitafoam executives and co-employee Steve Pendock with other Defendants' draft price increase letters, competitor price lists, and other information.

100.    During the Conspiracy Period, Vitafoam employee George Newton exchanged information with Carpenter employee Max Tenpow regarding the amount and effective date of price increases.  Newton also provided this conspiratorial information to other Defendants.

101.    In addition to these unlawful agreements to fix prices, the former Vitafoam executives and Defendants agreed to avoid each other's customers and refrain from taking business or market share from one another during the Conspiracy Period.

### b.    Recent Or Current Vitafoam Executives

102.    In addition, a former Woodbridge employee was employed in Ontario, Canada from 1986 to 2009 by Woodbridge and participated in the conspiracy.  While working at Woodbridge, this employee served most recently as Vice President of Commercial Sales, where he had authority to determine prices of Polyurethane Foam.  In April 2009, this former Woodbridge employee became Vitafoam's Vice President of Sales ("Current Vitafoam Vice President").  In his position at Vitafoam, he had authority to determine prices.  Current Vitafoam Vice President has also admitted to his role in the long-running price-fixing and customer-allocation conspiracy with other Defendants.

103.    Current Vitafoam Vice President engaged in conspiratorial activity while employed by Woodbridge and Vitafoam during the Conspiracy Period by reaching understandings and agreements on price increases with other Defendants.  These agreements concerned both the amount and the effective date of the price increases.

104.     During the Conspiracy Period, Current Vitafoam Vice President personally engaged in this conspiratorial conduct to fix prices and maintain market share with at least Woodbridge, Vitafoam, Foamex, Carpenter, Future Foam, Hickory Springs, Scottdel, Valle and Flexible Foam.  Coworkers at both Woodbridge and Vitafoam also participated in a number of similar discussions to further their illegal scheme.

105.     Information sworn under oath on July 21, 2010, by Pierre-Yves Guay of the Commissioner of Competition in Canada to support a search warrant describes information provided by "Witness A"—that is, Current Vitafoam Vice President—regarding conduct "in Canada and in the United States."  The information states under oath:  "Witness describes himself as someone who gathers and shares information across the foam sectors.  Witness A confirmed to Competition Law Officers that he had discussions, exchanges of information and agreements regarding the price of foam with the following contacts within the foam industry:

| Companies | Contacts | Positions |
|---|---|---|
| Foamex | Vinnie A. Bonaddio | Senior Vice President, Technical Products Group |
| Foamex | Don Phillips | Executive Vice President, Automotive Parts Division |
| Vallefoam [sic] | Tony Vallecoccia | President |
| DomFoam International Inc [sic] | John Howard | President |
| Ottobock [sic] | John Vins | Sales Manager |
| Plastomer | Bill Baughman | Chief Executive Officer |
| Inoac International Co. | Mike Cotter | Marketing Manager |
| Inoac International Co. | Ken Miya | Managing Director |
| Hickory Springs | Todd Councilman | Marketing – Sales Manager |
| Flexible Foam Products | Mike Crowell | VP Sales and Marketing |
| Vita | Mel Himel | President |
| Hickory Springs | Buster Mann | VP, Eastern Division |
| CMI Automotive | Jorge Canamero | President |

31

Conduit of information:

| Companies | Contacts | Positions |
|---|---|---|
| Bondtex Incorporated | Jerry Hightower | President |
| Cerex Fabric | Dan Holsenbeck | Sales Manager |
| Inoac USA | Max Ozeki | VP Foam Division |
| Morbern Inc | John Weaver | VP Sales and Marketing |

106.     The sworn affidavit from Pierre-Yves Guay separately states that it is the result of an investigation of "previous and ongoing conduct contrary to" the Competition Act of Canada by entities including Carpenter, Valle, Domfoam, A to Z Foam, Vitafoam Group, Foamex, Flexible Foam, Future Foam, Mohawk, Scottdel, Broadway Foam, Woodbridge, Leggett & Platt, and Hickory Springs.  The violations of law alleged in the affidavit concerned conduct both "in Canada and in the United States."

107.     During the Conspiracy Period, while he was employed by Woodbridge, Current Vitafoam Vice President also confirmed that he spoke to Bill Lucas, the president of Vitafoam, to discuss price increases specifically for foam applications in the automotive industry.  Bill Lucas also acted for Crest, which was controlled by Vitafoam, in these communications.

108.     Price increases for automotive foam products generally involved telephone calls, rather than letters.  However, Defendants discussed price increase letters for all types of foam products, even in communications specifically about automotive foam products, because this helped the Defendants and their co-conspirators coordinate price increases and timing of price increases for automotive foam products.  Like the coordinated price increases for Polyurethane Foam for other applications, the coordinated price increases for automotive applications— including both slabstock and molded Polyurethane Foam—allowed Defendants to increase prices

32

paid by customers.  These anticompetitive price increases were made to GM, as well as its component suppliers for GM platforms ("GM Suppliers"), such as Lear.

109.    Current Vitafoam Vice President, while he was employed by Woodbridge, also had contacts with Vincent Bonaddio at Foamex to discuss price increases for automotive foam products.

110.    In 2004, while employed by Woodbridge, Current Vitafoam Vice President attended a meeting at Crest with Bill Lucas, who was representing Vitafoam and Crest.  During the meeting, there was a discussion regarding price increases of foam.

111.    On May 26 and 27, 2010, Current Vitafoam Vice President attended a PFA meeting in Baltimore, Maryland.  While there, he discussed foam pricing with Michael Crowell of Flexible Foam.  Crowell asked why Vitafoam was not raising prices or following a recent price increase.  By that time, Vitafoam had already self-reported to the DOJ its involvement in illegal anticompetitive conduct in the Polyurethane Foam market.

112.    Another Vitafoam executive, the President, was previously the Director of Corporate Engineering at Woodbridge from 1985 until January 2008 ("Current Vitafoam President"), where he had authority to determine prices.  As the President of Vitafoam, a position he held beginning in August 2008, he also had authority to determine prices.  Along with other individuals from Defendant companies, he participated in the long-running price-fixing and customer-allocation conspiracy.

113.    During the Conspiracy Period, discussions with competitors in the foam industry involving Current Vitafoam President while he was at Woodbridge included conversations  about topics like business development or potential joint ventures, and then ultimately  led to

conspiratorial conversations about price increases.  These discussions about coordinating pricing took place during in-person discussions, email communications, and telephone conversations.

114.    During the Conspiracy Period, Current Vitafoam President participated in conspiratorial discussions concerning pricing in the Polyurethane Foam market with various competitors at both Woodbridge and Vitafoam, including at least Bill Lucas of Vitafoam; Donald Phillips and Vincent Bonaddio of Foamex; Michael Crowell of Flexible Foam; Tony Vallecoccia of Valle; Stanley Pauley of Carpenter; Don Simpson, Buster Mann, and Lee Lunsford of Hickory Springs; and Bruce Schneider and Robert Heller of Future Foam.  David Gurley also sent an email to Current Vitafoam President in which he acknowledged receiving draft price increase letters from competitor Don Simpson of Hickory Springs.  These discussions led to an understanding and agreement that the participants would discuss and implement coordinated price increases on similar effective dates.

115.    A Vitafoam executive had several communications with Dean Brayiannis from Valle, leading to an agreement on June 2009 on the promotional pricing for carpet foam for a shared customer.  This agreement to offer the same promotional pricing was followed after June 2009.

116.    Specifically, the price increases for Polyurethane Foam during the Conspiracy Period, starting from at least 1999 and continuing up to, if not beyond, Vitafoam's entry into the leniency program, were the result of conspiratorial discussions and illegal agreements among Defendants on pricing.

### 4.    Defendants Implement And Enforce The Conspiracy

117.    Defendants also undertook substantial efforts to police the conspiracy. Participants, including Former Vitafoam Sales Vice President, followed up after discussions with

other Defendants to determine if the specific agreed price increases and effective dates were implemented. If one of the Defendants did not agree to raise prices at the same amount or in the same time period as the other Defendants, the other Defendants would pressure that Defendant until it acquiesced.

118.   Furthermore, Defendants routinely exchanged and reviewed one another's price increase letters for both slabstock and molded foam to confirm that their conspiratorial agreements were being implemented. When a Defendant would fail to exchange or confirm its price increase letters, the other Defendants would hound that Defendant and threaten action to engage in competitive price wars against the non-cooperating Defendant.

119.   In April 2009, Defendants and their co-conspirators announced a Polyurethane Foam price increase which they had coordinated. Before making this price announcement, the head of Vitafoam's U.S. and Canadian logistics received a Future Foam Polyurethane Foam price increase announcement before Future Foam sent it to its customers. The Vitafoam employee shared the announcement with other Vitafoam conspiracy participants, including Vitafoam's national sales manager, who shared the Future Foam price increase announcement with Dean Brayiannis of Valle with the comment: "Who treats you better than me?" [sic]

120.   On April 9 or 16, 2010, in Cleveland, Ohio, Bruce Schneider of Future Foam spoke by telephone to an executive from Vitafoam. Schneider worked at Future Foam headquarters. Schneider called to inform Vitafoam that Future Foam, Foamex, and Flexible Foam intended to increase the price of Polyurethane Foam sold in the United States by 20% in the next weeks.

121.   On another call, Schneider again discussed price increases by the Defendants with Current Vitafoam President. Schneider stated:

35

> Now it's looking it's all everything is postponed to May 31st or June 1st.
> There is a letter out from Carpenter for 31st of May.  This is a letter out
> from Flexible for June 1st.  Foamex sent a letter two weeks ago at 15% but
> it looks like now that the increase is going to be 10 and 12% on foam.

Current Vitafoam President asked:  "Are you hearing anything from the other guys?  Or is it just

kinda market stuff?"  Schneider responded:  "Oh, from the other, the other people the foamers?

Yeah, we are hearing 10-12 . . . It's kinda what we hear from other people what they expect.  Ya

know, it would have been great to get 20% but I don't think so."

122.    On June 10, 2010, Bruce Schneider of Future Foam left a voicemail message for

Current Vitafoam President.  In this message, Schneider stated, "Hi [Current Vitafoam

President], this is Bruce Schneider . . . If you want to give me a call I've got information of why

the increase changed from 10 to 12 to 9."

123.    On May 20, 2010, John Howard, president of Domfoam, called Current Vitafoam

Vice President twice to voice complaints about a Vitafoam salesman, Normand Widmer,

attempting to acquire Domfoam customers.  During the call, Howard stated:

> Your fellow in Montreal here has been out, has his salesman Claude
> Robinson out knocking on doors they've never knocked on before, selling
> at or quoting at low low prices.  If he wants a battle, I'll give him a battle.
> . . .These guys have been in at accounts they've never sold at . . . if he
> wants a battle, he's got one.  We will start going after his accounts and it
> won't be pretty.  We'll both end up hurting . . . I'm pissed off and our
> sales guys are pissed off and they're saying "John, are you going to do
> something about this, or are you just going to let this guy keep quoting
> low prices and taking business away from us."  So.  I'll let the dogs loose
> or I don't let the dogs loose.  Want to mull it over and give me a shout
> back?

Current Vitafoam Vice President responded:  "It's sort of a bad time for me right now."

Howard then stated:

> I don't expect an answer right now but, I'm leaving tomorrow night for a
> week.  I would like to at least give the guys some indication that, "Guys,
> give me another week.  I think the dust is going to settle."  Or, "Guys just

36

do what you have to do.  Go follow their delivery trucks and find out who the customers are and start knocking on doors and do whatever the hell you have to do.  We have to respond."  So you're in a spot, I don't expect you to answer right now, but can you give me a shout back tomorrow?

124.   On May 25, 2010, Current Vitafoam Vice President called Howard back.  During

the call, Howard's statements reveal that Domfoam had an agreement or understanding with

Vitafoam and Foamex not to compete for each other's customers:

> Just, you know we've kind of stayed out of each other's way for some time here while business is quiet.  There's just no business to be had and dropping prices is only going to benefit the customers.  I can't afford to have him take stuff away . . . It'll be a rough go if he wants to go and quote prices in places where he's not currently selling . . . Tell Normand it's a, I mean we just don't even know who your accounts are.  We've just never interfered, but, if he's going to go selling to guys quoting prices at guys where he doesn't currently sell, we're going to go after his accounts.
>
> So, business decision, you know, whatever way the chips fall, that's the way they're going to fall, and life will go on.  But the buyers are asking me, you know, "John, you're always telling us to stay away."  We do the same thing with Foamex, we don't go after their accounts.  Haven't for a while business has been in the shitter.  Just kind of stayed away and they've stayed away from our accounts too, so prices have been fairly stable.  There ain't much business out there and dropping prices and only the customers are going to benefit.
>
> But let him make his decision and if it's to continue going after them then tell him there'll be some consequences.  That's it.  I'm not gonna, no threats but I can't not do anything.  The sales guys are getting kind of . . .. "Hey, John, you're telling us don't go here, don't go there, don't sell that one, don't go quote prices there."  You know, eventually they're going to think I got no nuts, so sooner or later I've got to tell them "Guys, just go and do what you got to do.". . . Keep an eye on this guy, it's ah, he needs coaching, there you go.

125.   On May 25, 2010, Howard also left a voicemail message for Current Vitafoam

Vice President:

> Hi, it's John . . . we never really did resolve anything, I guess I did most of the talking . . . where do we leave this thing , vis-à-vis going after each other's accounts.  I'd be quite happy just to let it settle right here and not do anything more.  But if [Current Vitafoam President] got some real

pressure on this fellow Widmer and he's going to continue to go after accounts that he currently doesn't sell, then I got to, I can't continue to hold our sales guys off.  So, give it some thought and maybe over the next day or two, just give me a shout and let me know.  I understand you can't override [Current Vitafoam President], but I can't just hold our guys at bay and  tell them, "Well, don't do anything guys," that's not a winning strategy for us either.  So, give me a call in the next day or two would you?  And let me know what course of action Widmer's going to take here.

126.   On June 2, 2010, two executives of Vitafoam spoke concerning a price increase announcement.  One of the Vitafoam executives explained it was important to talk to Raj Mehta of Crest about the price increase announcement.

127.   On June 4, 2010, Tim Prescott of Vitafoam left a voicemail message for  Current Vitafoam Vice President:

Hey, it's Tim . . . Can you give me a call when you get a chance.  I don't know whether you've spoken to [Current Vitafoam President] but I had a message earlier from Dale over at Carpenter and when I called him back he was asking what we're doing with the increase and he just called me again asking can VPS please call John Howard over at Domfoam.

128.   On June 3, 2010, Dean Brayiannis of Valle called a Vitafoam employee:

Brayiannis:     "I sent you a text regarding price increase letters.  I'm assuming you've got most of the ones that you wanted to see."

Vitafoam Employee:  "I didn't see, I had the old boy had faxed me one from a couple of days ago . . . Yah, okay, no problem, Yah, I guess, like that's, you know, it's game on again, isn't it."

Brayiannis:     "Ah, we'll see what happens.  I've got Carpenter, Flexible, Mohawk, Leggett."

Vitafoam Employee:  "But it's warranted, you know what I mean.  Like, we know the prices of raw material have been going up, so ah."

Brayiannis:     "Well, you know, I guess what we've gotta see is have another one right behind this one, hopefully the first one will stick right but I guess we will see what our friends at Carpenter will do."

Vitafoam Employee:  "Yah, yah.  Well, yah, like I say it's it's game on.
So I would imagine that most manufacturers will move forward with it.
We will have to see whether they, whether they do or not and see how that
goes."

Brayiannis:     "Yah, yah.  Alright.  Well our letter is out so hopefully I'm
assuming you've probably put something out by now."

Vitafoam Employee:  "It's as good as done."

Brayiannis:     "Okay.  Well we're already out, so we've already put our
letter out."

129.    On June 9, 2010, Brayiannis called a Vitafoam employee twice, first leaving a

voicemail message, then calling again to further discuss the price increase:

Brayiannis:     "Still haven't seen or heard of your increase letter yet."

Vitafoam Employee:  "Well, have a look around."

Brayiannis:     "I have.  Haven't found anything yet . . . I've still got one
guy telling me that you haven't issued a letter.  So have you issued?  Yes
or no?"

Vitafoam Employee:  "People will lie to you, Dean."

Brayiannis:     "Are you around the same time frame as us?  July 5th or
what?"

Vitafoam Employee:  "Ah, yah, close."

Brayiannis:     "Okay. And you haven't seen what, sorry?  You haven't
seen other increase letters or did you get all of those?"

Vitafoam Employee:  "Well, I know, I know that, know Stan, Stan said
that he'd seen the Mohawk one and . . . I guess one of the other U.S. guys.
You know, everyone waits for the leader and once the leader goes out then
everyone else follows cause we all know that the prices of material have
gone up so, you know what I mean?"

Brayiannis:     "Well at the end of the day over the last two increases we
have chatted about it so just wanna make sure you got your letter out."

Vitafoam Employee:  "Yah.  Okay pal."

130.    On May 25, 2010, Vitafoam received a call from a Carpenter employee, who informed Vitafoam that Carpenter would be raising its prices on June 28, 2010.  Six days later, on May 31, 2010, this Carpenter employee again called Vitafoam and told them that Carpenter would be raising prices by 11%.  The following day, Carpenter provided Vitafoam with a copy of the letter it sent to its customers, which included the dates and amounts of the price increases.

131.    After Vitafoam raised its own prices, this same Carpenter employee once again contacted Vitafoam, this time on June 15, 2010.  He spoke with Current Vitafoam Vice President and asked whether Vitafoam was "ready for round 2."  The Carpenter employee informed Current Vitafoam Vice President that Carpenter was preparing to send a letter the following day with a 12% price increase, effective July 19, 2010.  He also confirmed that manufacturers in the States were similarly raising prices.

132.    Once the two men finished discussing the details of the second price increase, they turned to a discussion of whether they should be speaking at all:

> Carpenter employee:  "Hey let me ask you something.  That new boss of yours, you've got a guy there apparently I heard doesn't want us to communicate.  Is that correct?"
>
> Current Vitafoam Vice President:    "Ahhh . . . yah, that's that's true.  That's ahh very true actually."
>
> Carpenter employee:  "Mine . . . [As you know] mine are the same right."
>
> Current Vitafoam Vice President:    "Oh I understand."
>
> Carpenter employee:  "But I heard that jeez, the same thing I guess this guy you've got, I forget his name now, said the same thing he doesn't want nobody to talk and I'm like holy [expletive] ok here we go."
>
> Current Vitafoam Vice President:    "Yah.  Well, you know, that's, that's, that's, that's policy so . . ."
>
> Carpenter employee:  "Yah."

40

Current Vitafoam Vice President:     "That's . . . it's corporate stuff right."

. . .

Carpenter employee:  "Ok.  You know, I'm actually waiting for a third one [price increase].  I think it is going to be a repeat of, what is it, last year or the year before, I don't know."

Current Vitafoam Vice President:     "It was about three years ago.  We didn't go up enough last year.  The prices have been, the prices have been pretty low for a bit."

Carpenter employee:  "Yah, you know what they've actually been too low really."

Current Vitafoam Vice President:     "Sorry?"

Carpenter employee:  "They've actually been too low."

133.    On May 27, 2010, Lee Lunsford of Hickory Springs called Current Vitafoam President and inquired whether Vitafoam was raising prices.  When Current Vitafoam President expressed hesitation about doing so, Lunsford noted that there was "no volume anywhere" and "there is twice as much capacity as demand."

134.    Despite this acknowledgment, on June 3, 2010, Lunsford again called Vitafoam, this time speaking with  Current Vitafoam Vice President.  In their conversation, Current Vitafoam Vice President informed Lunsford that Vitafoam was raising its prices at the end of the month.  Lunsford inquired how much and, when told it would be by approximately 12%, agreed that this was an acceptable number to Hickory Springs.

135.    The Defendants also exchanged emails in furtherance of the conspiracy to fix prices for Polyurethane Foam:

a.    In June 2000,  Current Vitafoam Vice President—who was an employee at Woodbridge at the time—sent an email to a Vitafoam salesperson asking whether he spoke to Don Phillips of Foamex to which the salesperson

41

responded:  "Yes, we told him we are going out with our letters 12%

effective July 30th; he said we would follow."

b.  During October and November 2004, Current Vitafoam Vice President—

who was an employee at Woodbridge at the time—reported his supervisor

at Woodbridge by email that he had discussions with Bill Lucas, acting for

Vitafoam and Crest, which resulted in an agreement for a Polyurethane

Foam price increase effective January 1, 2005.

c.  On October 21, 2004, Current Vitafoam Vice President—who was an

employee at Woodbridge at the time—sent an email to his supervisor at

Woodbridge where he said:  "Lucas and I are talking about our favorite

subject.  Jan. 1 as a possible date."  This email concerned a price increase

discussion for foam for the automotive sector with an effective date of

January 1, 2005.

d.  On November 2, 2004, Current Vitafoam Vice President—who was an

employee at Woodbridge at the time—sent an email to his supervisor at

Woodbridge and other superiors at Woodbridge saying that he "Met with

Lucas at PFA" and that Lucas was "most interested in their auto increases.

They will announce for Jan. 1.  They would go +20%."

e.  On March 9, 2005, Current Vitafoam Vice President—who was an

employee at Woodbridge at the time—sent an email to his supervisor at

Woodbridge with the subject header:  "Spoke to Lucas."  The email stated:

"They are going to market probably next week.  Looking for a Jan. 1

effective date.  Were going at 18%.  I said we would most likely be closer

to 15%." He reported that he "has not heard from Foamex" and "is going to try to call them again to see what number they will go with."

f.    On March 9, 2005, Current Vitafoam Vice President—who was an employee at Woodbridge at the time—sent an email to his supervisor at Woodbridge regarding another call with Bill Lucas, representing Vitafoam and Crest, which stated:  "Spoke with Lucas again last week.  We are trying to meeting [sic] in Chattanooga."  He also wrote:  "We use the schedule[d] discussions to lead into the real reasons for the calls.  Said that they were successful at the mills, in Furniture—they were still one [price increase] behind."  The email continued:  "I let him know we were going March 15th in Detroit [automotive sector].  He said they would probably wait until May 1.  Would have liked a more coordinated push."

g.    On May 5, 2005, Current Vitafoam Vice President, while employed at Woodbridge, emailed that he spoke with Bill Lucas of Vitafoam and Raj Mehta, the General Manager of Crest, regarding price increases for May 2005.  This relationship between Woodbridge, Crest, and Vitafoam continued for years.  In a June 2, 2010 conversation between Current Vitafoam Vice President and Current Vitafoam President, they discussed Mr. Mehta again and information to pass to him in furtherance of the conspiracy.

h.    On September 14, 2005, the head of a competitor company wrote to a Vitafoam executive and stated:  "In separate conversation, I talked to Lucas.  They are out with 11% on blocks nothing on Auto."  He asked the

43

Vitafoam executive to have one of his employees "call Buster [Mann at Hickory Springs] today."  After placing the call to Mann, the Vitafoam employee wrote:  "I called Buster yesterday.  We spoke about the bedding stuff.  It is at numbers we are not used to."

i.  On May 22, 2008, Nikki Walborn at Scottdel sent an email with an attachment of a draft Scottdel fuel surcharge and price increase letter to a number of Scottdel employees, including Louie Carson and Jeff Carter.  On May 29, 2008, Jeff Carter forwarded this email and price increase letter to David Gurley at Vitafoam, and Gurley then forwarded the email and price increase letter to his superior, the Current Vitafoam President.

j.  On July 7, 2008, Jeff Carter, while still at Scottdel, forwarded via email a draft price increase letter to David Gurley of Vitafoam, stating:  "David, Here is a copy of our next increase letter.  Jeff."  Gurley forwarded this email and draft increase letter to Current Vitafoam President, who forwarded them to his subordinates at Vitafoam, the vice president of sales and marketing and Steve Pendock.

k.  On July 9, 2008, Steve Pendock forwarded the email string and letter to Stan Miller of Vitafoam, with the message:  "Hey pal you thought the first one was tough!  Check with your Carpenter contact to see when they plan on pulling the trigger."

l.  On July 11, 2008, Stan Miller reported back to Pendock via email, stating:

Steve, I talked to Carpenter and he says that he has found his info. That Mohawk has gone up the 12 points on business other then the EOR orders from the show.  He said they went up the full 12% in Vancouver and they have gotten some for the business back.  He

44

had not heard of Scottdale [sic] increase but had been told that there was a good chance they would be going up.  I just talked to Randy from Shnier and he said from the pricing his sales people have found that Mohawk has not gone up.  Carmine has been after him for copies of their pricing but he can't get his hands on it.  He told me they lost an order to Mohawk in Calgary for Carpet Supermarket and that is where Ben Flagel is now.

Pendock asked in an email to Miller:  "Will Ben share info?"

Miller shortly thereafter on the same day responds to Pendock via email, stating:  "Dan from Carpenter just called and said they will be going up 13% on Aug. 11/08."

m.      On May 21, 2009, Steve Pendock of Vitafoam sent draft price increase letters to other Vitafoam employees.  One of the recipients, David Gurley of Vitafoam, forwarded those price increase letters to Jeff Carter, who had moved to Future Foam in Texas.  Jeff Carter then forwarded this email to David Carson and Louie Carson of Scottdel stating:  "Louie and David, You probably have seen all these.  It's crazy out there again, personally I don't think this is enough of an increase."

n.      Letters announcing a May 2009 increase from Flexible Foam dated April 7, 2009; from Mohawk dated April 10, 2009; from Carpenter dated April 13, 2009; from Vita Canada dated April 14, 2009; from Leggett & Platt dated April 15, 2009; and from Future Foam dated April 16, 2009, were all present in Vitafoam files.  Following that price increase, there was another in June 2009.  Price increase letters from Mohawk, Flexible Foam, Carpenter, and Future Foam all dated May 18, 2009, and from

Leggett & Platt and Vita Canada dated May 19, 2009, were also present in Vitafoam files.

o.  Louie Carson responded to Carter thanking Carter for the information. Carter forwarded his string of emails with Louie Carson back to David Gurley at Vitafoam.  Gurley forwarded the string to his superiors at Vitafoam, Current Vitafoam Vice President and Current Vitafoam President, with the message:  "Please keep this confidential and read from the bottom up.  It was sent to my friend Jeff Carter @Future Foam in Texas and talks about Vita and Ohio Valley.  Louie Carson is one of the owners of Scottdel."

**5.  Defendants Keep The Conspiracy Secret**

136.  As illustrated in this Complaint, the Vitafoam employees discussed herein and other participants in the conspiracy took numerous steps to avoid detection of their conspiracy. At times, full names would not be used in correspondence and instead participants would only use first names or initials.

137.  Conspirators took advantage of attending trade association meetings along with their competitors and met to discuss coordinating price increases outside of the formal meetings. During the Conspiracy Period, representatives of Defendants regularly met through such organizations as the PFA, International Sleep Products Association ("ISPA"), and Surfaces, a trade group that includes polyurethane carpet underlay producers.

138.  Representatives of Defendants claimed these trade association meetings were nothing more than "meet-and-greet" sessions with their competitors.

46

139.     Representatives of Defendants disguised their attendance at these events as information gathering but in fact used them as an opportunity to fix prices and divvy up their customers.

140.     Representatives of Defendants had no genuine intention of learning about the market at these meetings.  Defendants essentially controlled the Polyurethane Foam market and attended these meetings to further ensure and perpetuate their control.

141.     Defendants provided false or misleading explanations for the change in the price of Polyurethane Foam to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion.

142.     Defendants also visited one another's manufacturing facilities for the purported purpose of sharing technological and operational advances, but were actually using the opportunity to discuss coordinated price increases.  Defendants' employees also would avoid detection by communicating through publicly available fax machines at stores such as Staples so that the identification of the sender would be hidden on the fax transmittal.

### 6.     Law Enforcement Authorities Raid Defendants And Their Co-Conspirators

143.     In July 2010, law enforcement authorities from the DOJ, Canadian Competition Bureau ("CCB"), and the European Commission ("EC") executed coordinated raids on Defendants and their co-conspirators as part of investigations of illegal cartel activities among Polyurethane Foam manufacturers and distributors.  Upon information and belief, the DOJ, CCB, and EC opened these investigations when Vitafoam confessed to its participation in the conspiracy and agreed to cooperate with law enforcement agencies in their subsequent investigations.

B.      **Defendants Negotiated With GM In The United States And Entered Into Agreements With GM To Sell Polyurethane Foam At Prices Illegally Raised Through Their Conspiracy**

144.    During and after the Conspiracy Period, GM purchased Polyurethane Foam directly from Defendants.  GM used that Polyurethane Foam to manufacture motor vehicles for the United States market.  Defendants' unlawful conspiracy increased the prices of Polyurethane Foam that Defendants shipped directly to GM in the United States and elsewhere in North America.  The illegally inflated prices the Defendants charged GM for this Polyurethane Foam affected the cost of each motor vehicle GM manufactured for sale in the United States and elsewhere in North America.

145.    During and after the Conspiracy Period, procurement teams at GM based in the United States negotiated the prices, conditions, and quantities that governed all GM's purchases of Polyurethane Foam used in its motor vehicles manufactured for the United States market.  GM's United States procurement teams evaluated, qualified, and selected the Polyurethane Foam suppliers that serviced GM and its Suppliers, drafted all requests for quotes for Polyurethane Foam that would be purchased for GM facilities in the United States and elsewhere in North America, reviewed the responses to the requests for quotes, selected which Polyurethane Foam suppliers would supply each part to GM and its GM Suppliers, and awarded each Polyurethane Foam supplier GM's business.

146.    Accordingly, the prices for Polyurethane Foam were negotiated and agreed upon between GM's United States procurement teams, or by GM Suppliers pursuant to GM's direction.  GM's manufacturing facilities located in the United States and elsewhere in North America were not authorized to negotiate the price of Polyurethane Foam, nor did they determine the total quantity of Polyurethane Foam they required.  These are actions that were

48

directed by GM's United States-based procurement teams.  At all relevant times, GM in the United States directed the price, quantity, and specifications of Polyurethane Foam purchased for GM's manufacturing facilities located in the United States and elsewhere in North America.

147.    GM suffered the entire injury resulting from the artificially-inflated price of Polyurethane Foam, and the injury from the purchase of this price-fixed Polyurethane Foam was ultimately borne by GM in the United States.

### C.    Market Factors Support The Existence Of The Conspiracy

148.    Various market factors made the market for Polyurethane Foam highly susceptible to anticompetitive practices and unlawful collusion, which allowed Defendants to implement their anticompetitive conspiracy.

### 1.    Limited Competition

149.    As a result of the manufacturing and product characteristics of Polyurethane Foam, importation into the United States from outside North America is neither practical nor economical.  Consequently, the vast majority of Polyurethane Foam sold in the United States comes from North America or a company with a United States-based subsidiary.  Defendants— all of whom are based in the North America or have United States-based subsidiaries or affiliates—collectively represent the majority of Polyurethane Foam production.

150.    In addition, the industry has been consolidating rather than attracting new entrants.  Major players within this industry have actively acquired smaller companies and other competitors over the last ten years.  For example:

      a.    In 2007, Defendant Carpenter acquired its European competitor Dumo NV; and

b.      In 2006, following the purchase of its parent corporation, Defendant

Vitafoam, Inc. sold one of its plants to Olympic Products LLC (a joint

venture between Woodbridge and Hickory Springs) and sold another plant

to Flexible Foam Products.

### 2.    Inelastic Demand Due To Lack Of Substitutes

151.    Demand for Polyurethane Foam is relatively inelastic.  In furniture and bedding

applications, for instance, short staple polyester fiber and cotton can be used instead of

Polyurethane Foam, but both alternative materials have poor height recovery characteristics after

compression and are therefore inferior to Polyurethane Foam.  Steel springs recover well but

must be insulated from the user with some type of cushioning material—typically Polyurethane

Foam.  And though a few automotive manufacturers have begun to use molded foams containing

a small percentage of biocontent, there is currently no complete substitute for Polyurethane Foam

used in automotive applications.  Use of complete substitutes for Polyurethane Foam has only

been tried in concept cars designed by certain manufacturers.  Thus, comparing Polyurethane

Foam to alternative materials in terms of economics, comfort potential, ease of use, and

durability, there is no acceptable substitute.  Additionally, the total cost of the Polyurethane

Foam used in products such as automobiles or other motor vehicles is typically a relatively small

component of the overall manufacturing cost of those products.

### 3.    Standardized Commodity Product With High Degree Of Interchangeability

152.    Polyurethane Foam is a commodity product (one that is readily interchangeable

and for which competition is primarily driven by price rather than other market pressures, such

as branding and marketing) used in hundreds of consumer products to provide comfort, support,

safety, and durability.  Polyurethane Foam is interchangeable across manufacturers.  The last

major technological breakthroughs in the production of Polyurethane Foam occurred in the mid-1900s, and Polyurethane Foam is now classified as a commodity chemical product.

153.    Accordingly, each Defendant has the capability to produce the same or similar Polyurethane Foam products, and Polyurethane Foam customers make purchase decisions based principally on price.  This commoditization and interchangeability of Polyurethane Foam facilitated Defendants' conspiracy.

### 4.    High Barriers To Entry

154.    The Polyurethane Foam industry is characterized by high barriers to entry. Building a new manufacturing plant or increasing capacity costs a significant amount.  Thus, firms cannot enter the market for the production and sale of Polyurethane Foam without an enormous capital investment.  Moreover, Polyurethane Foam manufacturers must comply with regulatory requirements, such as emissions requirements and flammability standards, to be able to produce and/or sell Polyurethane Foam.

### 5.    Opportunities To Conspire

155.    Defendants are members of trade associations, including the PFA, ISPA, Alliance of Flexible Polyurethane Foam, Carpet Cushion Council, and Surfaces.  The PFA is one of the largest such trade associations, and approximately 70% of U.S. Polyurethane Foam manufacturers are PFA members.

156.    As discussed above, during trade association meetings – including PFA meetings – Defendants seized opportunities to meet in person to allocate customers and coordinate price increases.

## VII.    ACCRUAL OF CLAIM, CONTINUING VIOLATION, EQUITABLE TOLLING, AND FRAUDULENT CONCEALMENT

157.    GM did not discover, and could not have discovered through the exercise of reasonable diligence the existence of the conspiracy alleged herein prior to disclosure in 2010 of the raids by government agencies of certain Defendants' facilities.

158.    Since the start of the Conspiracy Period, Defendants and their co-conspirators have committed continuing violations of the antitrust laws resulting in monetary injury to GM. These violations each constituted injurious acts.

159.    In addition, Defendants' and their co-conspirators' agreement, understanding, and conspiracy in violation of the antitrust laws was kept secret.  As a result, GM was unaware of Defendants' unlawful conduct alleged herein and did not know that it was paying artificially high prices for Polyurethane Foam in the United States throughout the Conspiracy Period. Defendants and their co-conspirators affirmatively and fraudulently concealed their unlawful conduct.

160.    GM used a method of purchasing Polyurethane Foam that caused it to believe in good faith at the time that it was receiving competitive prices for Polyurethane Foam that it purchased from one or more of the Defendants and/or their co-conspirators.  Unfortunately, as alleged below, as a proximate result of the conspiracy, Defendants and their co-conspirators overcharged Plaintiff for Polyurethane Foam during time periods relevant to Plaintiff's antitrust claims despite Plaintiff's due diligence.

161.    GM did not discover, nor could have discovered through reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws until the above-referenced 2010 government raids occurred because Defendants and their co-conspirators used deceptive and secret methods to avoid detection and to affirmatively conceal their violations.

These deceptive and secret methods included, but were not limited to, using bi-annual meetings and site visits to disguise meetings used to coordinate price increases in polyurethane foam; avoiding use of full names, or in the alternative, the use of initials to refer to co-conspirators in communications; and the use of public facsimile machines to avoid disguise the source of communications regarding price increases.  In addition, Defendants used price increases in urethanes to disguise their own coordinated price increases in Polyurethane Foam and blamed the increase in the price of raw materials when explaining the coordinated price increases.

162.    Neither Defendants nor their co-conspirators told GM that they were fixing prices and allocating customers, or engaging in the other unlawful collusive practices alleged herein. The conspiracy by Defendants and their co-conspirators was inherently self-concealing.

163.    Defendants and their co-conspirators engaged in a successful price-fixing and customer allocation conspiracy that they affirmatively concealed

a.    By meeting secretly (including use of private telephonic and electronic communications) to discuss prices, customers, and markets of Polyurethane Foam in the United States and elsewhere;

b.    By agreeing among themselves at meetings and in communications not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their alleged scheme;

c.    By holding secret meetings outside and separate from the formal trade association meetings Defendants were publicly attending;

d.    By disguising price-fixing meetings and communications as technical and operational meetings,

e.      By sending communications in a manner designed to hide the origin or source of the communication, as detailed above;

f.      By either avoiding references in documents or the creation of documents otherwise generated in the ordinary course of business regarding conduct that would constitute antitrust violations or anticompetitive acts;

g.      By using code names to conceal the identity of co-conspirators in documents that would otherwise reflect antitrust violations or anticompetitive acts;

h.      By providing GM and others with false or misleading explanations for the change in the price of Polyurethane Foam to create the illusion that such price changes were the result of unilateral conduct when, in fact, they were the product of collusion; and

i.      By submitting prearranged, complementary losing bids, or declining to bid, on contracts for the sale of Polyurethane Foam to create the illusion of competition when, in fact, the bids submitted were not competitive.

164.    Due to the foregoing successful acts of concealment, no events did, or should have, excited GM's suspicions that the Defendants and their co-conspirators were engaging in a conspiracy to fix prices and allocate markets for Polyurethane Foam until certain Defendants were raided by government authorities in 2010.

## VIII.    EFFECT ON U.S. COMMERCE AND INJURY TO PLAINTIFF

165.    The conduct of Defendants and their co-conspirators has taken place in, and affected the continuous flow of interstate trade and commerce of, the United States, in that, *inter alia*:

a.  Defendants and their co-conspirators have sold Polyurethane Foam throughout the United States;

b.  Defendants and their co-conspirators have each used instrumentalities of interstate commerce to sell Polyurethane Foam throughout the United States;

c.  In furtherance of the conspiracy alleged herein, Defendants have traveled between states and have exchanged communications through interstate wire communications and via U.S. mail;

d.  The conspiracy alleged herein has affected billions of dollars of commerce; and

e.  Defendants and their co-conspirators have inflicted antitrust injury by artificially raising prices paid by GM and other entities who are themselves engaged in commerce.

166.  The unlawful contract, combination, and/or conspiracy alleged above had and is having, *inter alia*, the following effects:

a.  Prices charged by Defendants and their co-conspirators to GM and its Suppliers for Polyurethane Foam have been maintained at artificially high and supracompetitive levels;

b.  GM has been required to pay more for products containing Polyurethane Foam than it would have paid in a competitive marketplace unfettered by Defendants' and their co-conspirators' collusive and unlawful price fixing; and

      c.     GM has been deprived of the benefits of free, open, and unrestricted competition in the market for Polyurethane Foam.

167.    During and throughout the period of the contract, combination, or conspiracy alleged above, GM directly purchased Polyurethane Foam in the United States.

168.    GM paid more for the Polyurethane Foam than it would have paid under conditions of free and open competition.

169.    As a direct and proximate result of the illegal combination, contract, or conspiracy alleged above, GM was injured and financially damaged in its business and property in amounts to be determined at trial.

170.    GM suffered the type of antitrust injury that the federal laws were meant to punish and prevent.

## IX.   VIOLATIONS ALLEGED

### FIRST CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:
### VIOLATION OF SHERMAN ACT

171.    GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

172.    Beginning at a time presently unknown to GM, but at least as early as January 1, 1999, and continuing through the present, Defendants and their co-conspirators entered into a continuing agreement, understanding, and conspiracy in restraint of trade in violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and Section 4 of the Clayton Act, 15 U.S.C. § 15.

173.    In furtherance of the unlawful conspiracy, each of the Defendants and their co-conspirators has committed overt acts, including, *inter alia*:

a.　Agreeing to charge prices at certain levels and otherwise to fix, increase, maintain, and/or stabilize prices of Polyurethane Foam sold in the United States;

b.　Participating in meetings, conversations, and communications with co-conspirators regarding prices to be charged for Polyurethane Foam;

c.　Agreeing to allocate customers;

d.　Meeting with co-conspirators to keep the existence of the conspiracy unknown and to foster the illegal anti-competitive conduct described herein; and

e.　Refraining from competing by refusing to offer Polyurethane Foam at prices below the agreed-upon price.

174.　The combination and conspiracy alleged herein has had the following effects, including, *inter alia*:

a.　Price competition in the sale of Polyurethane Foam has been restrained, suppressed, and/or eliminated;

b.　Prices for Polyurethane Foam sold by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, noncompetitive levels; and

c.　GM has been deprived of the benefits of free and open competition.

175.　Defendants and their co-conspirators engaged in the activities described above for the purpose of effectuating unlawful agreements to fix, maintain, raise, and/or stabilize prices of Polyurethane Foam.

176.     As a direct and proximate result of Defendants' illegal agreement, contract, combination, trust, and/or conspiracy, GM has been injured and damaged in its business and property in an amount to be determined, and under Section 4 of the Clayton Act, 15 U.S.C. § 15, are entitled to recover threefold the damages sustained.

177.     The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

178.     Because GM faces a serious risk of future injury, GM is entitled to an injunction under Section 16 of the Clayton Act, 15 U.S.C. § 26, against all Defendants, preventing and restraining the violations alleged herein.  Defendants all continue to manufacture Polyurethane Foam, and the market for production and sale of Polyurethane Foam remains highly concentrated and susceptible to collusion.  Defendants continue to have the incentive to collude to increase Polyurethane Foam prices or stabilize Polyurethane Foam price declines, and Defendants' conspiracy to fix the price of Polyurethane Foam could be easily repeated and concealed from GM.

## SECOND CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:
## VIOLATION OF MICHIGAN ANTITRUST REFORM ACT

179.     GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

180.     GM believes and asserts that all GM's direct purchases of Polyurethane Foam and Products are actionable pursuant to the federal antitrust laws as alleged in the First Claim for Relief.  For its direct purchases, and any indirect purchases of Polyurethane Foam Products not actionable under the federal antitrust laws, GM alleges this Second Claim for Relief under the Michigan Antitrust Reform Act, Mich. Comp. Laws § 445.771 *et seq*.

181.    During and after the Conspiracy Period, GM purchased Polyurethane Foam from its headquarters in Michigan.  During that same period, it conducted a substantial volume of business in Michigan, including selling automotive components and other products containing Polyurethane Foam manufactured and sold by Defendants and others.  GM also maintained inventories of Polyurethane Foam and offices in Michigan.  As a result of its presence in Michigan and the substantial business it conducted, and continues to conduct, in Michigan, GM is entitled to the protection of the laws of Michigan.

182.    Beginning at a time presently unknown to GM but at least as early as January 1, 1999, and continuing to the present, Defendants and their co-conspirators entered into and engaged in a continuing conspiracy for the unreasonable restraint of trade or commerce, in violation of the MARA.

183.    The aforesaid violations of Section 2 of MARA consisted, without limitation, of a continuing unlawful conspiracy among Defendants and their co-conspirators, the substantial terms of which were to fix, control, and maintain the prices of, and to allocate markets for, Polyurethane Foam.

184.    For the purpose of forming and effectuating the unlawful conspiracy, the defendants and their co-conspirators have done those things which they combined and conspired to do, including but in no way limited to the acts, practices, and course of conduct set forth above and the following:

      a.    To fix, raise, maintain, and stabilize the price of Polyurethane Foam;

      b.    To allocate markets for Polyurethane Foam among themselves;

      c.    To submit rigged bids for the award and performance of certain Polyurethane Foam contracts; and

        d.       To allocate among themselves the production of Polyurethane Foam.

185.    Such conduct, including but not limited to the acts, practices, and course of conduct set forth above, was willful, shocking, or outrageous and amount to flagrant violations of MARA.

186.    The combination and conspiracy alleged herein has had, *inter alia*, the following effects:

        a.       Price competition in the sale of Polyurethane Foam has been restrained, suppressed and/or eliminated in Michigan and throughout the United States;

        b.       Prices for Polyurethane Foam have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels in Michigan and throughout the United States; and

        c.       Those who purchased Polyurethane Foam have been deprived of the benefit of free and open competition.

As a direct and proximate result of Defendants' conduct, GM was injured in its business and property by paying more for Polyurethane Foam than it would have paid in the absence of Defendants' combination and conspiracy.

187.    As a result of Defendants' flagrant violation of MARA, GM is entitled to recover threefold the damages sustained pursuant to Section 8 of MARA, Mich. Comp. Laws § 445.778(2).  GM is also entitled to recover interest on its damages from the date of the complaint, taxable costs, and the costs of suit, including reasonable attorneys' fees, pursuant to Section 8 of MARA, Mich. Comp. Laws § 445.778(2).

188.    The conduct of Defendants and their co-conspirators constitutes a per se violation of Section 2 of MARA, Mich. Comp. Laws § 445.772.

**THIRD CLAIM FOR RELIEF AGAINST ALL DEFENDANTS:**

**UNJUST ENRICHMENT AND DISGORGEMENT OF PROFITS**

189.    GM incorporates by reference as if fully set forth herein the allegations contained in the preceding paragraphs of this Complaint.

190.    By paying more for Polyurethane Foam than it would have in the absence of Defendants' wrongful conspiracy and combination to fix, control, and maintain the prices of, and to allocate the markets for, Polyurethane Foam, GM has conferred a benefit on Defendants.

191.    As a result of Defendants' wrongful conspiracy and combination to restrain trade, Defendants were able to charge more for Polyurethane Foam resulting in overpayments by GM.

192.    Defendants have been unjustly enriched by GM's overpayments.  Defendants' retention of these monies violates the fundamental principles of justice, equity, and good conscience.  Defendants should be required to disgorge to GM the amount of that unjust enrichment at least in the amount in excess of the reasonable value GM would have paid in the absence of Defendants' conspiracy and combination to restrain trade.

**X.    PRAYER FOR RELIEF**

WHEREFORE, GM requests that:

A.    The Court adjudge and decree that the acts of the Defendants are illegal and unlawful, including the agreement, contract, combination, or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators be adjudged to have been:

1.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act, as alleged in the First Claim for Relief; and

2.      An unreasonable restraint of trade or commerce in flagrant violation of the Michigan Antitrust Reform Act, as alleged in the Second Claim for Relief.

B.      That GM recover damages, as provided by federal and Michigan antitrust laws, and that a judgment be entered in favor of GM against Defendants, jointly and severally, in an amount to be trebled in accordance with such laws;

C.      That Defendants, their affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct, contract, conspiracy, or combination alleged herein, or from entering into any other conspiracy or combination having a similar purpose or effect, and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

D.      That GM be awarded pre- and post-judgment interest, and that such interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

E.      That GM recover taxable costs pursuant to the MARA;

F.      That GM recover its costs and disbursements of this suit, including reasonable attorneys' fees as provided by law; and

G.      That GM be awarded such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(a) of the Federal Rules of Civil Procedure, GM demands a jury trial as to all issues triable by a jury.

Dated:  November 7, 2012                    Respectfully submitted,

                                            */s/ Jesse J. Kirchner*

Jesse J. Kirchner (Michigan Bar No. P75717)
Kent A. Gardiner
Kathryn D. Kirmayer
CROWELL & MORING LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004
Telephone:  202-624-2500
Fax:  202-628-5116
Email:  jkirchner@crowell.com
            kgardiner@crowell.com
            kkirmayer@crowell.com

Daniel A. Sasse
Chahira Solh
CROWELL & MORING LLP
3 Park Plaza, 20th Floor
Irvine, CA  92614
Telephone:  949-263-8400
Fax:  949-263-8414
Email:  dsasse@crowell.com
            csolh@crowell.com

*Counsel for Plaintiff General Motors LLC*